54 P.3d 837

**Jeremy FLANDERS, a single man, Plaintiff–Appellee, Cross–Appellant,**

v.

**MARICOPA COUNTY, a political subdivision of the State of Arizona; The Maricopa County Sheriff's Office, an administrative agency of Maricopa County; Joseph M. Arpaio and Ava Arpaio, husband and wife, both individually and in his capacity as chief administrative officer of the Maricopa County Sheriff's Office, Defendants–Appellants, Cross–Appellees.**

No. 1 CA–CV 01–0239.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 26, 2002.

Law Offices of Joel B. Robbins By Joel B. Robbins, and The Law Offices of Tracy A. Gromer By Tracy A. Gromer, Phoenix, for Plaintiff–Appellee, Cross–Appellant.

Burch & Cracchiolo, P.A. By Brian Kaven, Daryl Manhart, Suzanne E. Ingold, Phoenix, for Defendants–Appellants, Cross–Appellees.

## OPINION

LANKFORD, Judge.

¶ 1 Jeremy Flanders was severely injured after he was brutally attacked by other inmates at the "Tent City" Maricopa County Jail facility. Flanders brought an action in superior court against defendants, the Sheriff and his wife, the Sheriff's Office ("MCSO"), and Maricopa County. Flanders alleged that defendants' gross negligence and civil rights violations rendered them responsible for his injuries. A jury returned verdicts in favor of Flanders.

¶ 2 The County and the Sheriff challenge the judgment entered after the verdicts. By

cross-appeal Flanders attacks the entry of judgment as a matter of law in favor of the County on the civil rights claim and the dismissal of MCSO after the verdict.

¶ 3 We address these questions: (1) Do verdicts initially inconsistent but later reconciled by the jury require a mistrial? (2) Does the evidence support the judgment? (3) Is the County liable for the Sheriff's civil rights violations? (4) Did the Sheriff waive a claim of qualified immunity?

¶ 4 We affirm the judgment in favor of Flanders. On the cross-appeal, we reverse the rejection of the civil rights claim against the County. We find it unnecessary to decide whether the superior court correctly dismissed MCSO.

¶ 5 We must review the evidence in a light most favorable to sustaining the jury verdict and affirm the judgment if substantial evidence supports it. *See Warrington v. Tempe Elem. Sch. Dist. No. 3*, 197 Ariz. 68, 69, ¶ 4, 3 P.3d 988, 989 (App.1999). "We must not 'take the case away from the jury' by combing the record for evidence supporting a conclusion or inference different from that reached here.... 'Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'" *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 56, ¶ 27, 961 P.2d 449, 454 (1998) (citations omitted). Our statement of the facts reflects this approach, focusing on the evidence that supports the verdict against the defendants. We discuss the facts at some length because defendants challenge the sufficiency of the evidence against them.

¶ 6 Flanders was an inmate in the jail facility known as "Tent City" because prisoners are housed in tents. He had been sentenced to a year of confinement in a Maricopa County jail. He was sent to Tent City in December 1995.

¶ 7 Flanders was a trustee, whose duties included serving meals to other inmates. To gain trustee status and the opportunity for activity this status offered, he had to live in Tent City. The other option was "regular" jail, where inmates are locked down for twenty-three hours a day. Half Anglo and half Hispanic, Flanders was pressured to join competing jail gangs. Flanders instead chose to be "by himself."

¶ 8 On May 10, 1996, Flanders had finished his trustee work, eaten dinner, and returned to his tent. He was alone and fell asleep in his bunk. During a shift change for jail guards, and apparently while he slept, Flanders was violently assaulted.

¶ 9 Flanders later could not remember what had happened to him and did not know why he had been assaulted. However, witnesses saw five or six individuals wearing hoods run into Flanders' tent. The group apparently pulled Flanders off his bunk, struck him with various objects, and kicked and jumped on him. No one could identify the attackers. Other inmates heard noises of the assault, including Flanders' moans and cries.

¶ 10 One witness saw an assailant use a tent spike to beat Flanders on the head, neck and shoulders. Tent spikes were made of steel rebar and were used to secure the tents to the ground. Another witness heard a tent spike drop on the concrete floor of Flanders' tent during the assault.

¶ 11 The attack complete, another inmate entered the tent and found Flanders unconscious, gasping for air, and spewing blood out of his mouth, nose and ears. Flanders had been bloodied and beaten so badly that the other inmate initially did not recognize Flanders.

¶ 12 No jail guards had arrived, so the other inmate carried Flanders over his shoulders for almost 100 yards, across the yard and into the main building. Flanders was laid at the feet of several detention officers. His eyes were rolled back in his head; his body was bloody and his face was swollen.

¶ 13 Flanders' injuries were severe and some were permanent. He suffered a closed head injury and was in a coma for several days. Permanent brain damage resulted. He has loss of motor function, loss of sensation in his left hand, and permanent loss of cognitive function causing · short-term memory loss. Flanders also suffers from psychologi-

cal problems, likely to be permanent, including anxiety and depression.

¶ 14 At the time of the attack, no guards were present in the yard or at the tents. No alarm sounded. No guard saw or heard the beating or noticed Flanders being carried across the yard.

¶ 15 Flanders sued the Sheriff,[1] the MCSO, and the County for the damages resulting from the beating. Flanders alleged that the policies set by the Sheriff on behalf of the County created conditions at Tent City which had violated his rights to humane confinement conditions under the Eighth Amendment to the United States Constitution.[2] These violations gave rise to the civil rights claim for damages under 42 U.S.C. § 1983. Flanders also asserted that defendants had been grossly negligent in operating Tent City and that their negligence had contributed to his injuries.[3]

¶ 16 At trial, the parties presented evidence about security problems at Tent City. The tents are located in a yard adjacent to a more permanent structure containing, among other things, toilets and showers, an area for meals, and a "day room."

¶ 17 Tent City is supposed to be a minimum security classification facility for minimum security prisoners on trustee status. The Sheriff described Tent City as a place where he was "entertaining drug dealers and sex offenders and murderers, too, with no more than two or three detention officers guarding them at any one time." He acknowledged, however, that some inmates who had been violent "on the outside" were also violent "on the inside."

¶ 18 Tent City has capacity for 1000 inmates. Most of the tents housed twenty men each, although two held forty each. The facility generally was full. Guards counted 900 inmates the day Flanders was attacked. Some inmates left the tents during the day for work release or to work as trustees, but by evening when Flanders was assaulted, most would have returned.

¶ 19 Guards were stationed indoors, in an area known as the "fishbowl," to observe inmates. However, guards inside the facility could not see the tents outside.

¶ 20 A single guard was assigned to the tent area and was expected to stay in the yard for eight hours. This guard ventured outside only occasionally, however, usually staying inside the air-conditioned fishbowl. On the day of Flanders' attack, the assigned yard guard was inside gathering his gear for the shift change when he learned of the assault.

¶ 21 Another guard was stationed in a tower in the corner of the yard, fifty-feet above the ground. Visibility from the tower into the tents and the surrounding yard was limited and the tower guard could not respond quickly to events in the yard.

¶ 22 Guard patrols were sporadic. After the regular head count was performed at about 6:00 p.m., guards rarely entered the yard. Flanders had been attacked at about 6:20 p.m. Inmates had a system for warning each other whenever guards entered the tent area.

¶ 23 The tents at Tent City are not secure. The Sheriff admitted that a tent was "only canvas" and could be uplifted easily. Tent flaps were usually open for ventilation, and inmates freely roamed in and out of the tents. A lockdown to confine inmates was impossible. According to one former inmate, "[Y]ou can do whatever you want in the tents."

¶ 24 The Sheriff conceived the idea of housing inmates in tents and was the architect of Tent City policy. He acknowledged that he had intentionally made conditions in the tents uncomfortable. The tents were neither air-conditioned nor cooled by evaporation: Evaporative coolers had been replaced by fans. Temperatures inside the

---

1. The Sheriff was named individually and in his capacity as chief policy maker for the County's jail system.

2. The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.

3. The complaint asserted other claims, but at trial the jury was instructed only on these causes of action.

tents could exceed 100 degrees, and the heat made the inmates irritable and tense. The Sheriff had also denied inmates access to cigarettes and coffee and the food was scanty and unappetizing. The Sheriff acknowledged that he had said that he may spend more to feed his dogs than it costs to feed inmates.

¶ 25 Contraband of various kinds, including weaponry, was pervasive. Some inmates returning from work release brought in contraband, but much more came in over the perimeter fences. The tents were surrounded by two chain link fences about twelve feet high and seven feet apart. Outside access to these fences could be gained from a nearby road, a parking lot, or the wall of a nearby office building. Inmates regularly obtained forbidden items by having them tossed over the fences, an activity facilitated by the absence of guards in the yard. Contraband items included cigarettes, matches, lighters, fireworks, magazines, knives, drugs, and food. The Sheriff and other jail authorities knew about the delivery of contraband across the fences.

¶ 26 Inmate fights were common. Some were spontaneous acts of violence over cigarettes or candy; others were arranged as a means of dispute resolution. Groups of inmates would sometimes "beat down" an inmate as they did Flanders. These fights often occurred without any intervention by guards. Unless a guard was in the yard, inmates could engage in combat without detection.

¶ 27 Jail authorities knew about the assaults. Jailers frequently received reports from inmates that another inmate or inmates were "after" them. Some inmates displayed obviously fresh injuries.

¶ 28 Jail authorities were also aware that most assaults were unreported. Inmates were often reluctant to report problems for fear of being branded a "snitch" and suffering retaliation. An inmate also might refrain from reporting threats because "protective custody" meant being "locked down" for twenty-three hours of each day.

¶ 29 Tent City inmates had access to and used a variety of objects as weapons. Fire extinguishers, which the Fire Marshal re-

quired to be easily accessible, served as clubs. Tent stakes could be worked free and were easily hidden. Jail personnel had been instructed to inspect for loose stakes. But missing stakes were simply replaced and no effort was made to prevent future removal. Other available weapons included tent side poles, padlocks, broomsticks, rocks, soap, and sharpened pens, pencils, and toothbrushes.

¶ 30 Some of these weapons had been used previously in a Tent City incident. In September 1995, inmate tension erupted in a melee which seriously injured a dozen or more people. Some tents were knocked down, and one witness saw "a mass of people fist fighting and tent stakes swinging and fire extinguishers" before the yard was "swamped by detention officers." The Sheriff testified that he did not recall this episode. Yet he said he was always concerned about security and violence and would have known of any serious violence.

¶ 31 Although the Sheriff contended that there had "never [been] any incident to speak of" at Tent City, he later acknowledged that a riot had occurred there in November 1996. Inmates took several guards hostage during this incident.

¶ 32 The Sheriff claimed that the 1996 disturbance was insignificant: "[T]hese things happen. You have riots in jails and prisons every day.... [N]othing happened ...; [e]verything turned out great." However, the Sheriff also acknowledged that taking a hostage was a "pretty serious offense," and that the November incident had been the subject of a 2000–page written report. The Sheriff repeatedly described Tent City as "safe" and a "great operation" where everything was "running smoothly" with "no problems."

¶ 33 The Sheriff acknowledged that objects had been used as weapons in Tent City. When asked about the rocks, rebar and tent poles, he said: "I will not deny that these can be used and have been used as weapons in [Tent City]...." He admitted being told about incidents of inmates throwing rocks at the guards. But he claimed to know nothing about a threat made by an inmate to assault him with rebar during the Sheriff's overnight

stay at Tent City.[4] He also professed knowing nothing about the availability of rebar as a weapon in Tent City.

¶ 34 The Sheriff said he lacked knowledge about the number and positioning of the Tent City guards. He denied that violence was related to a decreased level of inmate supervision. The Sheriff also denied knowing who Flanders was or having any knowledge about the assault. He did not recall reading investigative reports. At the same time, he insisted: "If there is any serious violence [in Tent City], I am sure I would know about it."

¶ 35 Both the Sheriff and the County acknowledged that the Sheriff was responsible for operating the County's jails and had ultimate authority over them. Sheriff Arpaio had conceived the idea for housing inmates in tents during his election campaign. After he was elected, he created Tent City. The Sheriff lacked prior experience in operating correctional institutions and conducted no study before creating Tent City. Yet no other institution like it existed in the United States.

¶ 36 The Sheriff's idea in creating Tent City was to send a message to law enforcement officers that the Sheriff would make room in the tents for any arrestee. The Sheriff claimed he had visited the tents "constantly" over the seven years of their existence, talked to the inmates, and spent at least two nights sleeping in the tents.

¶ 37 James Coughlin testified as Flanders' expert regarding correctional facilities. Coughlin had operated major jails in metropolitan areas for many years and had experience with prisoner supervision. Coughlin was the director of the King County jails in Seattle for ten years, operated Pierce County jail in Tacoma for five years, and chaired the Washington State Correction Association for three years. He also served for years as a consultant to the United States Justice Department's corrections and jail programs, performing studies on jail conditions, including control of jail populations.

¶ 38 Coughlin testified that the Sheriff and the County had been deliberately indifferent to the care and safety of the prisoners at Tent City. He testified that the facility was dangerous and could not be made secure without increased staffing. Staffing at Tent City was inadequate for the number of inmates. Availability of contraband including weapons was a serious problem well-known to the Sheriff. Placing a guard in the tower was not effective to observe or control the inmates. Staff shift changes unnecessarily left the prisoners unsupervised for ten to fifteen minutes, regularly, three times a day. The staffing problem was exacerbated because guards in an understaffed facility tend to fear being out among so many prisoners. Yet if they are not among the jail population, the guards cannot provide protection.

¶ 39 Coughlin also testified that the Sheriff's removal of all privileges deprived the Sheriff of the only way to discipline an unruly inmate other than removing him from the facility. The lack of options made it difficult for jail staff to handle prisoners. "When you run a jail where people have nothing and ... are afraid because they don't have proper supervision and they can't get the help they may need, you increase the risk of violence...." Coughlin described simple steps to reduce contraband and weapons and to increase the staffing level. These included cementing tent stakes, moving the two perimeter fences so that contraband is less easily thrown into the facility, and conducting shift changes in the yard.

¶ 40 On the final day of testimony, the superior court granted the County's motion for judgment as a matter of law on Flanders' § 1983 claim only. The County remained a defendant on the gross negligence claim. The court therefore instructed the jury on the § 1983 claim against the Sheriff and MCSO, and on the gross negligence claim against the Sheriff, MCSO, and the County. The jury returned verdicts in favor of Flanders on both claims.

¶ 41 When the jury first returned, it brought two signed verdict forms with a different amount of compensatory damage for each claim. After consulting with counsel,

---

4. However, this threat had been described in the Sheriff's book, "America's Toughest Sheriff," about which he was questioned at trial.

the court instructed the jury that the amount on each verdict form must be the same. The jury met and then returned with verdicts containing the same amount of compensatory damages, $440,532, and a punitive damages award of $195,000.

¶ 42 The jury had been instructed that, if it rendered a verdict for Flanders on his claim of gross negligence, it could consider Flanders' own fault and allocate a percentage of fault to him. The verdict form for the gross negligence claim also contained spaces for allocation of percentages of fault to the Sheriff, the County, and MCSO.[5]

¶ 43 The jury was not instructed to consider Flanders' comparative fault in relation to the civil rights claim. The plaintiff verdict form returned by the jury for the civil rights claim listed only "the Defendants Arpaio and/or Maricopa County Sheriff's Department."

## I.

¶ 44 Defendants argue on appeal that the superior court erred by declining to grant a mistrial based on the initially inconsistent damage amounts on the two forms of verdict. The court instead re-instructed the jury as follows:

> The verdicts are inconsistent. There can only be one figure for nonpunitive damages. Therefore, the amount for nonpunitive damages must be the same on each verdict form.
>
> If you intend to find for the plaintiff on both the civil rights claim and the gross negligence claim, you have to have the same amount for nonpunitive damages.

¶ 45 The superior court fully complied with the controlling rule. Arizona Rule of Civil Procedure 49(c) directs the court to call the jurors' attention to a defect in a verdict and "send them back for further deliberation." The court's instruction did exactly that. After their attention was directed to the inconsistency, the jurors returned a single figure for compensatory damages.

¶ 46 Defendants urge that only a mistrial could remedy "hopeless" jury confusion or the jury's "disregard" of the court's instructions. The jury had been instructed on two separate causes of action and was given a form of verdict for each. Each form of plaintiff verdict contained a space to insert a number for compensatory damages. Given the differences in the forms and the instructions accompanying them, the initial inconsistency is not extraordinary or incomprehensible. The superior court scrupulously followed Rule 49(c), which is designed to remedy this situation. That the jury returned appropriately consistent verdicts after a supplemental instruction confirms that the jury neither disregarded its instructions nor was hopelessly confused.

¶ 47 Defendants rely on *Berry v. McLeod,* 124 Ariz. 346, 604 P.2d 610 (1979), but that case does not show that the inconsistency here was incurable. In *Berry,* both sides agreed that the verdicts were so inconsistent that they could not be corrected. *Id.* at 350, 604 P.2d at 614. The jury in *Berry* had deliberated for two weeks and deadlocked on five issues. *Id.*

¶ 48 Also contrary to defendants' contention, the superior court's instruction did not suffer from the same defect found in *Gomez v. Tucson Yellow Cab Co.,* 127 Ariz. 563, 622 P.2d 510 (App.1980). In *Gomez,* the trial court "instructed the jury that [the original verdicts] constituted a finding of liability" and gave them two new forms of verdict on which to enter damages. *Id.* at 564, 622 P.2d at 511. The court thus did not allow the jury to reconsider liability. In this case, the court complied fully with Rule 49(c) by pointing out the inconsistency and instructing the jury that "if" it intended to find for Flanders, the compensatory damage number had to be the same. This was not error.

## II.

¶ 49 Defendants also attack the ver-

---

5. The jury assessed the percentages of fault on the gross negligence claims as follows: Flanders 29%, Maricopa County 8.5%, Sheriff Arpaio 35.5% and MCSO 27%. Defendants later suc-

ceeded in eliminating the percentage assessed against MCSO from the judgment on the gross negligence claim on the grounds that MCSO was not a "jural" entity.

dict as unsupported by the evidence.[6] In considering whether sufficient evidence supports the jury verdict, we look to the broad scope of the trial and do not attempt to reweigh the facts or comb the record for evidence supporting a conclusion or inference different from that reached by the jury. *Hutcherson*, 192 Ariz. at 56, ¶ 27, 961 P.2d at 454.

¶ 50 The evidentiary standard for a § 1983 claim based on constitutional violations by conditions of confinement is framed by *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). On appeal, the parties agree that *Farmer* is controlling. *Farmer* acknowledged the "settled" proposition that a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment to the United States Constitution, and the opinion established the meaning of "deliberate indifference." *Id.* at 832, 834, 114 S.Ct. 1970. The Eighth Amendment imposes duties on prison officials to take reasonable measures to guarantee inmate safety. In particular, prison officials have a duty to protect inmates from violence at the hands of other prisoners. *Id.* "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' ..., having stripped them of virtually every means of self-protection ..., the government and its officials are not free to let the state of nature take its course." *Id.* at 833, 114 S.Ct. 1970 (citations omitted). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 833–34, 114 S.Ct. 1970 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

¶ 51 Plaintiffs must meet two requirements in such cases. They must first show that the incarceration is under condi-

tions posing a substantial risk of serious harm. They must also show that the prison official has a sufficiently culpable state of mind, known as "deliberate indifference." *Id.* at 834, 114 S.Ct. 1970. The standard for the latter requirement is that the official was both aware of facts from which one can infer that substantial risk of serious harm exists *and* in fact drew that inference. *Id.* at 837, 114 S.Ct. 1970. This is equivalent to the criminal law standard of conscious disregard of a substantial risk of serious harm. *Id.* at 839–40, 114 S.Ct. 1970. However, an inmate need not prove that the official acted or failed to act "believing" that harm actually would befall an inmate; it is enough that the official was aware of a substantial risk of serious harm. *Id.* at 842, 114 S.Ct. 1970.

¶ 52 The jury decides whether a prison official had the requisite awareness as a question of fact. *Id.* That fact can be shown by circumstantial evidence. For example, a jury may conclude that a prison official knew of a substantial risk because the risk was obvious. *Id.*

¶ 53 Defendants argue that Flanders failed to prove deliberate indifference. They contend that Flanders proved neither that he had complained about his safety nor that the risk *to him* was long-standing, pervasive and well-documented or known to prison officials. But *Farmer* specifically states that officials need not actually believe harm will befall a particular inmate. *Id.* at 843–44, 114 S.Ct. 1970. What is required is knowledge of substantial risk to inmates generally. *Id.; see also Gilbert v. Quinet*, 91 Ariz. 29, 33, 369 P.2d 267, 269 (1962) (relevant inquiry for foreseeability of risk looks at anyone in plaintiff's position, not a particular plaintiff).

¶ 54 Nor did the evidence fail to show that defendants knew Flanders had been subject to substantial risk.[7] Viewed most favorably

---

**6.** Defendants moved for judgment as a matter of law at the close of the evidence and again in a post-trial motion. Judgment as a matter of law is appropriate "only if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant." *Shoen v. Shoen*, 191 Ariz. 64, 65, 952 P.2d 302, 303 (App.1997). In their motion for new trial, defendants similarly argued that the

verdict was against the weight of the evidence. They also raise that issue on appeal.

**7.** The jury was instructed it could find for Flanders *only* if Flanders proved by a preponderance of the evidence that the Sheriff actually "knew" of the substantial risk of harm to which Flanders was subjected. Because the jury was not instructed that it could infer defendants' knowl-

to Flanders, the evidence demonstrated that defendants knew that all inmates of Tent City were subjected to a substantial risk of violence. Unlike the cases on which defendants rely, the evidence in this case amounts to more than proof of a few isolated incidents or of violence inherent in every penal institution. *See, e.g., McGhee v. Foltz,* 852 F.2d 876 (6th Cir.1988); *Elliott v. Byers,* 975 F.2d 1375 (8th Cir.1992).

¶ 55 Flanders presented evidence that violence occurred with considerable and needless frequency. He presented evidence that, among other things, the Sheriff and his deputies had actual knowledge that prisoners used rebar tent stakes and tent poles as weapons and did nothing to prevent it. The Sheriff admitted knowing about, and in fact intentionally designing, some conditions at Tent City that created a substantial risk of inmate violence: *i.e.,* the lack of individual security and inmate control inherent in a tent facility; the small number of guards; a mixed inmate population subject to overcrowding, extreme heat, and lack of amenities. The history of violence, the abundance of weaponry, the lack of supervision, and the absence of necessary security measures supports the jury's finding of deliberate indifference to inmate safety.

¶ 56 The jury heard some testimony that the Sheriff was unaware of the unsafe conditions at Tent City. However, the jury was entitled to disbelieve the Sheriff. *See State v. Gallagher,* 169 Ariz. 202, 203, 818 P.2d 187 (App.1991) (credibility of a witness is for the trier-of-fact to determine, not for an appellate court). One of several reasons it could have done so was that his testimony was conflicting. For example, he claimed to have intimate knowledge of Tent City conditions and acknowledged having received monthly reports. However, he denied knowing many safety-related facts of obvious importance, including the level of violence, the types of

attacks by inmates, or the attack on Flanders. The jury apparently rejected parts of the Sheriff's testimony that favored defendants.

¶ 57 Defendants attack the gross negligence verdict as faulty "for the same reasons as the deliberate indifference claim." But the same evidence supports the verdicts on both claims. Defendants do not suggest that there can be no gross negligence verdict even if the § 1983 verdict is sustained by the evidence.

¶ 58 The evidence also supports the punitive damages award against the Sheriff. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

¶ 59 The evidence concerning unsafe conditions in Tent City was essentially undisputed, even by jail authorities. The evidence was abundant that authorities were aware of and ignored grave risks to life and limb at Tent City. Indeed, the essence of the defense was a claimed lack of knowledge. The jury could properly determine that the Sheriff was callously indifferent to the Eighth Amendment's requirements and to the exposure of Tent City inmates to serious injury. Accordingly, the jury's award of punitive damages was proper and we do not disturb the award on appeal.[8]

### III.

¶ 60 In his cross-appeal, Flanders argues that the superior court erred by directing a verdict for the County on his § 1983 claim. The court granted the directed verdict because there was "no evidence of a policy ... giving rise to a[§ ] 1983 claim against the

---

edge from the pervasiveness of the risk or other circumstantial evidence, as permitted by *Farmer,* defendants arguably benefitted from a more favorable instruction on this issue than they were entitled to receive.

**8.** The superior court also declined to reduce or set aside the punitive damages verdict or to grant

a new trial based upon the same arguments defendants assert here. We recognize the trial judge's "special perspective" of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record. *Hutcherson,* 192 Ariz. at 53, ¶ 12, 961 P.2d at 451.

County." Flanders argued that the County was liable for the policies made by the Sheriff, the designated County policymaker regarding jail operations.

¶ 61 The County is responsible for the Sheriff's jail policies. It is well-established that a governmental entity is liable under § 1983 when injury is inflicted by execution of that entity's policy, whether made by its lawmakers or by those whose edicts or acts "may fairly be said to represent official policy." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Arizona Supreme Court recognized this principle in *City of Phoenix v. Yarnell*, 184 Ariz. 310, 909 P.2d 377 (1995), which discussed municipal liability for constitutional torts arising out of governmental policies. *Id.* at 317–18, 909 P.2d at 384–85. The court noted that a policy may be established by even "the single act of a policymaker" if that official has final policymaking authority. *Id.* at 318, 909 P.2d at 385 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). Liability is imposed, not on the grounds of *respondeat superior*, but because the agent's status cloaks him with the governmental body's authority. *Id.* at 317–18, 909 P.2d at 384–85.

¶ 62 Flanders' claim was brought against the Sheriff both individually and in his official capacity as policymaker for Tent City. The § 1983 claim was based upon the policies and procedures regulating confinement conditions at Tent City. Under the Arizona Constitution, a sheriff is a county officer whose duties are to be fixed by law. Ariz. Const. art. XII, §§ 3 and 4. Arizona Revised Statutes ("A.R.S.") § 11–441(A)(5) (2001) directs the sheriff to "[t]ake charge of and keep the county jail...." The County acknowledged that the Sheriff was its chief policymaker for this jail facility.[9]

¶ 63 The Sheriff set the conditions of Flanders' confinement by establishing policies in his role as chief administrator for County jails. That the Sheriff may also be individually liable for conditions he established at this facility does not negate the County's liability for his actions as the person who exercises the County's governmental authority. There may be no "clearer case of county liability" than for the policies of a sheriff charged by law with responsibility for a county's jails. *Blackburn v. Snow*, 771 F.2d 556, 571 (1st Cir.1985).

¶ 64 Because the judgment against the Sheriff was for constitutional violations committed in his official capacity, the County is liable as a matter of law. *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Such a judgment imposes liability upon the public entity that the official represents, *whether or not* that entity is joined as a party, provided the public entity received notice and an opportunity to respond. *Id.* The public entity in this case, the County, was a named defendant and did defend the action. We therefore reverse and remand with instructions for entry of judgment against the County and the Arpaios, jointly and severally, for compensatory damages on the § 1983 claim.

## IV.

¶ 65 Finally, the Sheriff asserts that he is entitled to qualified immunity, but he has waived this contention. The Sheriff first raised the issue in his motion for judgment as a matter of law following the verdict. "An issue raised for the first time after trial is deemed to have been waived." *Medlin v. Medlin*, 194 Ariz. 306, 308, ¶ 6, 981 P.2d 1087, 1089 (App.1999). Moreover, as an immunity from suit rather than a defense to liability, a qualified immunity claim should be resolved at the earliest possible stage of the litigation. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *see also City of Yuma v. Evans*, 85 Ariz. 229, 233, 336 P.2d 135, 138 (1959) (The defense of governmental immunity "must be specially pleaded ... and [ ] cannot be urged for the first time on appeal."); *Guzman–Rivera v. Rivera–Cruz*, 98 F.3d 664, 667 (1st Cir.1996) ("Qualified immunity is an affirmative defense, and the 'burden of pleading it rests with the defendant ... [and] failure to do so can work

---

9. Whether a particular official has "final policymaking authority" is a matter of state law. *McMillian v. Monroe County*, 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).

a waiver of the defense.' ") (citations omitted).[10]

¶ 66 Our resolution of the issues means that Flanders will have judgment on the § 1983 claim for the full amount of compensatory damages against the County and the Sheriff. His full recovery against all defendants on one cause of action renders it unnecessary to reach any other issue relating to Flanders' gross negligence claim, including whether the court should have stricken MCSO's share of fault from the judgment on the ground that it was a "non-jural" entity, i.e., one that could not be sued.[11]

¶ 67 Accordingly, the judgment against the Arpaios is affirmed, including punitive damages. The entry of judgment as a matter of

law in favor of the County on the § 1983 claim is reversed, and the case is remanded for entry of judgment for compensatory damages against the County and the Arpaios, jointly and severally.

CONCURRING: JOHN C. GEMMILL, Presiding Judge, and JAMES B. SULT, Judge.

---

10. Waiver aside, qualified immunity does not protect an official who violates "clearly established" constitutional rights of which a reasonable official would have known. *Hunter,* 502 U.S. at 227, 112 S.Ct. 534. The constitutional right to conditions of confinement without substantial risk to life and limb was clearly established and indeed the jury was instructed, without objection by the Sheriff, that it was "settled" that conditions of confinement are subject to constitutional scrutiny. The standard for what is "clearly established" is objective—*i.e.,* the standard of a reasonable official—and the question is one of law. *State v.Super. Ct. (Donaldson ),* 185

Ariz. 47, 49–50, 912 P.2d 51, 53–54 (App.1996). The Sheriff neither contended that confining inmates under perilous conditions was constitutionally permissible or that he reasonably believed it was permissible.

In addition, the defense of qualified immunity would not have protected the County from liability under § 1983. *Brandon,* 469 U.S. at 472–73, 105 S.Ct. 873.

11. We urge counsel to resolve questions of proper parties and "jural" entities at the outset of a case rather than after the verdict.