**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

COUNTY OF MARICOPA, Arizona,
*Defendant-Appellant*,

and

PAUL PENZONE,* in his official
capacity as Sheriff of Maricopa
County, Arizona,
*Defendant.*

No. 15-17558

D.C. No.
2:12-cv-00981-ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, Senior District Judge, Presiding

Argued and Submitted September 15, 2017
San Francisco, California

Filed May 7, 2018

---

* Paul Penzone is the current Sheriff of Maricopa County and has, therefore, been automatically substituted for his predecessor, Joseph M. Arpaio. *See* Fed. R. Civ. P. 25(d).

Before: Ronald M. Gould, Richard C. Tallman, and Paul J. Watford, Circuit Judges.

Opinion by Judge Watford

## SUMMARY**

### Civil Rights

The panel affirmed the district court's summary judgment in favor of the United States, which brought this action to halt racially discriminatory policing policies concerning traffic stops instituted by Joseph Arpaio, the former Sheriff of Maricopa County, Arizona.

The panel held that Sheriff Arpaio acted as a final policymaker for the County. The panel further held that because the traffic-stop policies at issue fell with the scope of a sheriff's law-enforcement duties, Arpaio acted as a final policymaker for Maricopa County when he instituted those policies.

The panel held that Title VI of the Civil Rights Act of 1964 and 34 U.S.C. § 12601 authorized policymaker liability. The panel further held that the proper standard for determining which employees have the power to establish an entity's "official policy" under Title VI and 34 U.S.C. § 12601 is the standard that governs under 42 U.S.C. § 1983. The panel concluded that Maricopa County was liable for

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

violations of Title VI and § 12601 stemming from its own official policies.  Finally the panel held that when Arpaio adopted the racially discriminatory traffic-stop policies at issue, he acted as a final policymaker for the County, and the district court correctly held the County liable for the violations of Title VI and § 12601 caused by those policies.

The panel held that the district court properly applied issue preclusion to bar the County from relitigating the lawfulness of Arpaio's traffic-stop policies because the County was bound by prior adverse findings. *See Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

## COUNSEL

Richard K. Walker (argued), Walker & Peskind PLLC, Scottsdale, Arizona, for Defendant-Appellant.

Elizabeth Parr Hecker (argued) and Thomas E. Chandler, Attorneys; Gregory B. Friel, Deputy Assistant Attorney General; Civil Rights Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

**OPINION**

WATFORD, Circuit Judge:

The United States brought this action to halt racially discriminatory policing policies instituted by Joseph Arpaio, the former Sheriff of Maricopa County, Arizona. Under Arpaio's leadership, the Maricopa County Sheriff's Office (MCSO) routinely targeted Latino drivers and passengers for pretextual traffic stops aimed at detecting violations of federal immigration law. Based on that and other unlawful conduct, the United States sued Arpaio, MCSO, and the County of Maricopa under two statutes: Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 34 U.S.C. § 12601 (formerly codified at 42 U.S.C. § 14141).[1] The district court granted summary judgment in favor of the United States on the claims relating to the unlawful traffic stops; the parties settled the remaining claims. Maricopa County is the lone appellant here. Its main contention is that it cannot be held liable for the unlawful traffic-stop policies implemented by Arpaio.

We begin with a summary of the lengthy legal proceedings involving Arpaio's unlawful policing policies. In an earlier class action lawsuit, *Melendres v. Arpaio*, a group of plaintiffs representing a class of Latino drivers and passengers sued Arpaio, MCSO, and the County of Maricopa

---

[1] Title VI prohibits discrimination on the basis of "race, color, or national origin" in programs or activities that receive federal funding; § 12601 authorizes the United States to obtain declaratory and injunctive relief against any governmental authority that engages in a "pattern or practice of conduct by law enforcement officers" that deprives persons of rights protected by federal law.

under 42 U.S.C. § 1983 and Title VI. They alleged that execution of Arpaio's racially discriminatory traffic-stop policies violated their rights under the Fourth and Fourteenth Amendments. Following a bench trial, the district court ruled in the plaintiffs' favor and granted broad injunctive relief, which we largely upheld on appeal. *See Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012); *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015) (*Melendres II*).

While the *Melendres* action was proceeding, the United States filed this suit. Among other things, the United States challenged the legality of the same traffic-stop policies at issue in *Melendres*. The United States named as defendants Arpaio, in his official capacity as Sheriff of Maricopa County; MCSO; and Maricopa County. Early on, the district court dismissed MCSO from the action in light of the Arizona Court of Appeals' decision in *Braillard v. Maricopa County*, 232 P.3d 1263 (Ariz. Ct. App. 2010), which held that MCSO is a non-jural entity that cannot be sued in its own name. *Id.* at 1269.

Throughout the proceedings below, the County argued that it too should be dismissed as a defendant, on two different grounds. First, the County argued that when a sheriff in Arizona adopts policies relating to law-enforcement matters, such as the traffic-stop policies at issue here, he does not act as a policymaker for the county. He instead acts as a policymaker for his own office, or perhaps for the State. The County contended that, because Arpaio's policies were not policies of the County, it could not be held liable for the constitutional violations caused by execution of them. Second, the County argued that, even if Arpaio acted as a policymaker for the County, neither Title VI nor 34 U.S.C.

§ 12601 permits a local government to be held liable for the actions of its policymakers.

The district court rejected both of the County's arguments. The court then granted the United States' motion for summary judgment with respect to claims predicated on the traffic-stop policies found unlawful in *Melendres*. The court held that the County was barred by the doctrine of issue preclusion from relitigating the issues decided in the *Melendres* action, which by that point had reached final judgment. The County does not contest that if the *Melendres* findings are binding here, they establish violations of Title VI and § 12601.

On appeal, Maricopa County advances three arguments: (1) Arpaio did not act as a final policymaker for the County; (2) neither Title VI nor § 12601 renders the County liable for the actions of its policymakers; and (3) the County is not bound by the *Melendres* findings. We address each of these arguments in turn.

I

We have already rejected Maricopa County's first argument—that Arpaio was not a final policymaker for the County. In *Melendres v. Maricopa County*, 815 F.3d 645 (9th Cir. 2016) (*Melendres III*), we noted that "Arizona state law makes clear that Sheriff Arpaio's law-enforcement acts constitute Maricopa County policy since he 'has final policymaking authority.'" *Id.* at 650 (quoting *Flanders v. Maricopa County*, 54 P.3d 837, 847 (Ariz. Ct. App. 2002)). Because that determination was arguably *dicta*, we have conducted our own analysis of the issue, and we reach the same conclusion.

To determine whether Arpaio acted as a final policymaker for the County, we consult Arizona's Constitution and statutes, and the court decisions interpreting them. *See McMillian v. Monroe County*, 520 U.S. 781, 786 (1997); *Weiner v. San Diego County*, 210 F.3d 1025, 1029 (9th Cir. 2000). Those sources confirm that, with respect to law-enforcement matters, sheriffs in Arizona act as final policymakers for their respective counties.

Arizona's Constitution and statutes designate sheriffs as officers of the county. The Arizona Constitution states: "There are hereby created *in and for each organized county of the state* the following officers who shall be elected by the qualified electors thereof: a sheriff, a county attorney, a recorder, a treasurer, an assessor, a superintendent of schools and at least three supervisors . . . ." Ariz. Const. Art. 12, § 3 (emphasis added). The relevant Arizona statute explicitly states that sheriffs are "officers of the county." Ariz. Rev. Stat. § 11-401(A)(1).

Arizona statutes also empower counties to supervise and fund their respective sheriffs. The county board of supervisors may "[s]upervise the official conduct of all county officers," including the sheriff, to ensure that "the officers faithfully perform their duties." Ariz. Rev. Stat. § 11-251(1). The board may also "require any county officer to make reports under oath on any matter connected with the duties of his office," and may remove an officer who neglects or refuses to do so. Ariz. Rev. Stat. § 11-253(A). In addition, the county must pay the sheriff's expenses. Ariz. Rev. Stat. § 11-444(A); *Braillard*, 232 P.3d at 1269 n.2. As Maricopa County conceded in *Melendres*, those expenses include the costs of complying with any injunctive relief ordered against Arpaio and MCSO. *See Melendres III*, 815 F.3d at 650. A

county's financial responsibility for the sheriff's unlawful actions is strong evidence that the sheriff acts on behalf of the county rather than the State. *See McMillian*, 520 U.S. at 789; *Goldstein v. City of Long Beach*, 715 F.3d 750, 758 (9th Cir. 2013).

The limited guidance Arizona courts have provided on this topic further confirms that sheriffs act as policymakers for their respective counties. Most on point is *Flanders v. Maricopa County*, 54 P.3d 837 (Ariz. Ct. App. 2002), which held that then-Sheriff Arpaio acted as a final policymaker for Maricopa County with respect to jail administration. *Id.* at 847. *Flanders* relied in part on the fact that the statutory provision that specifies a sheriff's powers and duties lists "tak[ing] charge of and keep[ing] the county jail" as one of them. *Id.* (citing Ariz. Rev. Stat. § 11-441(A)(5)). That same provision also lists a wide array of law-enforcement functions that fall within the sheriff's powers and duties. Ariz. Rev. Stat. § 11-441(A)(1)–(3). Maricopa County does not explain why the Sheriff would be a final policymaker for the County with respect to jail administration but not with respect to the law-enforcement functions assigned to him in the same provision.

It is true that sheriffs in Arizona are independently elected and that a county board of supervisors does not exercise complete control over a sheriff's actions. Nonetheless, "the weight of the evidence" strongly supports the conclusion that sheriffs in Arizona act as final policymakers for their respective counties on law-enforcement matters. *See McMillian*, 520 U.S. at 793. Because the traffic-stop policies at issue fall within the scope of a sheriff's law-enforcement duties, we conclude that Arpaio acted as a final policymaker for Maricopa County when he instituted those policies.

## II

Maricopa County next argues that, even if Arpaio acted as the County's final policymaker, neither Title VI nor 34 U.S.C. § 12601 permits the County to be held liable for his acts. Whether either statute authorizes policymaker liability is an issue of first impression. We conclude, informed by precedent governing the liability of local governments under 42 U.S.C. § 1983, that both statutes authorize policymaker liability.

The concept of policymaker liability under § 1983 is well developed. Section 1983 imposes liability on any "person" who, while acting under color of law, deprives someone of a right protected by the Constitution or federal law. In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that the term "person" includes municipalities, which had the effect of creating liability for local governments under § 1983. *See id.* at 690. But the Court also limited the scope of that liability. It concluded that a local government may not be held vicariously liable for the acts of its employees under the doctrine of *respondeat superior*. *Id.* at 691. Instead, liability arises only if a local government's own official policy or custom caused the deprivation of federal rights. *Id.* at 694. As the Court later explained, this "official policy" requirement is intended to ensure that a municipality's liability "is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Under policymaker liability, only certain employees of a local government have the power to establish official policy

on the government's behalf.  The government's legislative body has such power, of course, but so do officials "whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.  Such officials are those who exercise "final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillian*, 520 U.S. at 784–85 (internal quotation marks omitted).  In essence, policymaker liability helps determine when an act can properly be deemed a government's own act, such that the government may be held liable for deprivations of federal rights stemming from it.

We think this same concept of policymaker liability applies under both Title VI and § 12601.  As to Title VI, the Supreme Court has held that an entity's liability is limited to the entity's own misconduct, as it is under § 1983.  *See Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 640 (1999); *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 285 (1998).[2]  Thus, while an entity cannot be held vicariously liable on a *respondeat superior* theory, it can be held liable under Title VI if an official with power to take corrective measures is "deliberately indifferent to known acts" of discrimination. *Davis*, 526 U.S. at 641.  An entity can also be held liable for acts of discrimination that result from its own "official policy."  *Gebser*, 524 U.S. at 290; *see Mansourian v. Regents of the University of California*, 602 F.3d 957, 967 (9th Cir. 2010); *Simpson v. University of Colorado Boulder*, 500 F.3d 1170, 1177–78 (10th Cir. 2007).  Because this form of

---

[2] *Davis* and *Gebser* involved Title IX of the Education Amendments of 1972, but "the Court has interpreted Title IX consistently with Title VI."  *Barnes v. Gorman*, 536 U.S. 181, 185 (2002).

"official policy" liability resembles § 1983 policymaker liability, we think the proper standard for determining which employees have the power to establish an entity's "official policy" under Title VI is the standard that governs under § 1983.

We reach the same conclusion with respect to § 12601. As relevant here, the statute provides: "It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601(a).

Section 12601 shares important similarities with § 1983. Section 1983 was enacted to create "a broad remedy for violations of federally protected civil rights." *Monell*, 436 U.S. at 685. Section 12601 was also enacted as a remedy for violations of federal civil rights, specifically for violations that are systematically perpetrated by local police departments. *See* Barbara E. Armacost, *Organizational Culture and Police Misconduct*, 72 Geo. Wash. L. Rev. 453, 527–28 (2004). And, like § 1983, § 12601 imposes liability on local governments. Indeed, the language of § 12601 goes even further than § 1983, making it unlawful for "any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority" to engage in the prohibited conduct. 34 U.S.C. § 12601(a).

We need not decide whether the language of § 12601 imposes liability on the basis of general agency principles, as the United States urges here. It is enough for us to conclude, as we do, that § 12601 at least imposes liability on a

governmental authority whose own official policy causes it to engage in "a pattern or practice of conduct by law enforcement officers" that deprives persons of federally protected rights. *Id*. Because of the similarity between § 12601 and § 1983, we again see no reason to create a new standard for determining which officials have the power to establish a governmental authority's official policy. The same standard that governs under § 1983 applies here as well.

In short, Maricopa County is liable for violations of Title VI and § 12601 stemming from its own official policies. As discussed above, when Arpaio adopted the racially discriminatory traffic-stop policies at issue, he acted as a final policymaker for the County. Those policies were therefore the County's own, and the district court correctly held the County liable for the violations of Title VI and § 12601 caused by those policies.

III

Lastly, Maricopa County challenges the district court's application of issue preclusion, which precluded the County from relitigating the lawfulness of Arpaio's traffic-stop policies. Given the nature of the County's involvement in the *Melendres* action, we conclude that the County is bound by the adverse findings rendered in that action.

The County was originally named as a defendant in the *Melendres* action, along with then-Sheriff Arpaio and MCSO. Early in the litigation, the parties stipulated to dismissal of the County as a named defendant, without prejudice to the County's being rejoined as a defendant later in the litigation if that became necessary to afford the plaintiffs full relief. *Melendres III*, 815 F.3d at 648. In effect, the County agreed

to delegate responsibility for defense of the action to Arpaio and MCSO, knowing that it could be bound by the judgment later despite its formal absence as a party.

The case proceeded to trial against Arpaio and MCSO and resulted in judgment against them. On appeal, we concluded that MCSO had been improperly named as a defendant because it could not be sued in its own name following the Arizona Court of Appeals' intervening decision in *Braillard*. *Melendres II*, 784 F.3d at 1260 (citing *Braillard*, 232 P.3d at 1269). Pursuant to the parties' stipulation, we ordered that the County be rejoined as a defendant in lieu of MCSO. *Id.* We later explained that we did so "[t]o assure a meaningful remedy for the plaintiffs despite MCSO's dismissal." *Melendres III*, 815 F.3d at 648. The County challenged this ruling in a petition for rehearing en banc and a petition for writ of certiorari, both of which were denied. *See id.*

Given this history, the district court properly applied issue preclusion to bar the County from relitigating the *Melendres* findings. Each of the elements of offensive non-mutual issue preclusion is satisfied: There was a full and fair opportunity to litigate the identical issues in the prior action; the issues were actually litigated in the prior action; the issues were decided in a final judgment; and the County was a party to the prior action. *See Syverson v. International Business Machines Corp.*, 472 F.3d 1072, 1078 (9th Cir. 2007). Indeed, the County contests only the last element, arguing that it was not in fact a party to *Melendres*. That is not accurate as a factual matter, because the County was originally named as a defendant in *Melendres* and is now one of the parties bound by the judgment in that action. Moreover, even though the County did not remain a party to *Melendres* throughout the litigation, it effectively agreed to

be bound by the judgment in that action.  Such an agreement is one of the recognized exceptions to non-party preclusion. *See Taylor v. Sturgell*, 553 U.S. 880, 893 (2008).

**AFFIRMED.**