IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

JENNIFER BRAILLARD, personal              )
representative of the Estate of Deborah    )
Ann Braillard, deceased; JENNIFER          )
BRAILLARD, surviving daughter of           )
Deborah Ann Braillard,                     )
                                           )
                  Plaintiff/Appellant/     )    2 CA-CV 2009-0059
                  Cross-Appellee,          )    DEPARTMENT B
                                           )
        v.                                 )    O P I N I O N
                                           )
MARICOPA COUNTY; MARICOPA                  )
COUNTY SHERIFF'S OFFICE; JOSEPH M.         )
ARPAIO and AVA ARPAIO, husband and         )
wife; CINCY RODRIGUEZ; RANDAL S.           )
HARENBERG and CARLENE HARENBERG,           )
husband and wife; DIANE GALAVIZ;           )
KARYN KLEINSCHMIDT, nka KARYN              )
SCHWARTZ; STEPHANIE LEPPERT;               )
SANDRA M. GARFIAS; and                     )
LUCY F. AKPAN,                             )
                                           )
                  Defendants/Appellees/    )
                  Cross-Appellants.        )
                                           )

APPEAL FROM THE SUPERIOR COURT OF PINAL COUNTY

Cause No. CV2006-01548

Honorable William J. O'Neil, Judge

AFFIRMED IN PART; REVERSED IN PART; REMANDED

Stinson Morrison Hecker LLP
  By Michael C. Manning, Leslie E. O'Hara,
  and John T. White                                    Phoenix
                                        Attorneys for Plaintiff/
                                        Appellant/Cross-Appellee

Wilenchik & Bartness, P.C.
  By Dennis I. Wilenchik and M. Rob Somers              Phoenix
                              Attorneys for Defendants/Appellees/
                              Cross-Appellants Arpaio, Harenberg,
                                   Galaviz, Schwartz, Leppert,
                                        Garfias, and Akpan

Zwillinger Greek Zwillinger & Knecht PC
  By Scott H. Zwillinger and Sara R. Witthoft           Phoenix
                              Attorneys for Defendants/Appellees/
                                Cross-Appellants Maricopa County
                                             and Rodriguez

V Á S Q U E Z, Judge.

¶1      In this wrongful death and survival action brought under state law and 42 U.S.C. § 1983, Jennifer Braillard (Braillard) sued Maricopa County (the County), Maricopa County Sheriff Joseph Arpaio, the Maricopa County Sheriff's Office (MCSO), and seven individual MCSO and County employees, for damages arising from the death of her mother, Deborah Braillard (Deborah).

¶2      On appeal, Braillard argues the trial court erred in granting defendants' motions for summary judgment on her substantive claims and on her claims for punitive damages and damages for Deborah's pain and suffering pursuant to § 1983. On cross-appeal, the defendants argue the court erred in denying their motion to dismiss MCSO as a nonjural entity; denying their motion for summary judgment on Braillard's standing to bring a wrongful death action under § 1983; denying their motion for summary judgment

2

on Braillard's state-law negligence and gross negligence claims; and in its rulings on two discovery-related disputes.

¶3 For the reasons stated below, we reverse the trial court's grants of summary judgment in favor of all defendants on Braillard's § 1983 survival claims and her associated claims for damages and on her state-law claims with respect to defendant Cincy Rodriguez. We also reverse the court's denial of summary judgment with respect to Braillard's standing to file a wrongful death claim pursuant to § 1983 and its denial of the defendants' motion to dismiss MCSO as a nonjural entity. However, we affirm the court's discovery rulings and its denial of defendants' motion for summary judgment on Braillard's state claims.

## Factual and Procedural Background

¶4 We view the facts in the light most favorable to Braillard, the party against whom summary judgment was granted. *See Corbett v. ManorCare of Am., Inc.*, 213 Ariz. 618, ¶ 2, 146 P.3d 1027, 1030-31 (App. 2006). On the night of January 1, 2005, Deborah was arrested on suspicion of drug possession and taken to the Fourth Avenue county jail in Phoenix. At the jail, defendant Cincy Rodriguez, a nurse with Maricopa County Correctional Health Services (CHS), conducted Deborah's medical screening interview. The screening, which lasted fifty-nine seconds, failed to ascertain that Deborah was an insulin-dependent diabetic. She then was transferred to K-Dorm at Estrella Jail the next day with no indication that she was in need of regular insulin injections.

3

¶5        On January 3, other inmates observed Deborah "moaning and groaning" and vomiting.  By the evening of January 4, "[s]he was basically unconscious . . . .  She couldn't speak.  She couldn't eat. . . .  She defecated on herself several times."  Inmates who asked the detention officers on duty to get help for Deborah were told:  "There's nothing we can do about it.  You just have to deal with it.  This is jail.  Get over it."

¶6        At 3:00 p.m. on January 4, defendants Karyn Schwartz and Randal Harenberg, MCSO detention officers, started their shift in K-Dorm.  Schwartz saw Deborah sitting at a table and believed she was sitting there because she was not feeling well.  Other inmates apparently informed Harenberg that Deborah was suffering from drug withdrawal, and two of them helped walk her to her bunk.  Harenberg was "concerned . . . to the point where every time [he] went on a security walk . . . [he] stopped by her bunk and checked on her."  At 3:25 p.m., Harenberg noted in the K-Dorm logbook that Deborah was "complaining of being sick [and] can't breathe" and that he had called CHS.  However, none of the CHS staff on duty acknowledged having received such a call, and no one from CHS came to K-Dorm to check on Deborah.  At 6:30 p.m., she was too sick to stand in line for her dinner, and Harenberg allowed another inmate to bring her a meal.

¶7        At 8:17 p.m., Deborah's friend Michael Amsberry attempted to visit her at the jail but was told she was too ill to come to the visitation area.  At 9:42 p.m., another friend, Debbie Fouts, called MCSO, concerned that Deborah had not received medication while in jail.  The MCSO officer who received the call, Brenda O'Neil, sent a facsimile

4

to inform Estrella Jail's medical clinic, but the facsimile apparently was neither picked up nor read by anyone there.

¶8 The next shift started at 11:00 p.m. During this shift, only one detention officer was on duty in K-Dorm, defendant Sandra Garfias. Another officer, defendant Diane Galaviz, was assigned to escort duty and conducted a security walk during the shift. Garfias heard Deborah vomiting more than twice, and at 2:45 a.m. on January 5, moved Deborah from the dormitory to the day room because her "groaning [and] yelling" were keeping the other inmates awake. Deborah continued groaning and calling out, "Why me?" and "Help me" until around 5:00 a.m. Defendants Lucy Akpan and Stephanie Leppert took over from Garfias at 7:00 a.m. Deborah was moved back to her bunk, where she vomited again. Akpan observed that she appeared weak and "very sick."

¶9 That morning, Braillard telephoned CHS risk manager Dennis Flynn and expressed concern that Deborah might not have been receiving appropriate treatment for her diabetes while she was in jail. Flynn contacted a nurse at the Estrella Jail medical clinic, who had Deborah brought to the clinic. She was given insulin and oxygen and transferred by ambulance to Maricopa County Medical Center, where she died eighteen days later from diabetic ketoacidosis.

¶10 Braillard brought this action, in her individual capacity and on behalf of Deborah's estate, against Sheriff Arpaio, MCSO, and detention officers Karyn Schwartz, Randal Harenberg, Sandra Garfias, Diane Galaviz, Lucy Akpan, and Stephanie Leppert (collectively, the MCSO defendants), and also against Maricopa County and CHS nurse

5

Cincy Rodriguez (collectively, the County defendants).[1]  The trial court granted the

defendants' motions for summary judgment with respect to Braillard's § 1983 claims and

entered an order of final judgment pursuant to Rule 54(b), Ariz. R. Civ. P.  Braillard

timely filed a notice of appeal, and the County defendants and MCSO defendants filed

separate and timely notices of cross-appeal.

## Discussion

**Capacity to Sue and be Sued**

¶11            Before addressing the trial court's grant of the defendants' motion for

summary judgment on Braillard's § 1983 claims, we consider two cross-appeal

arguments affecting Braillard's standing to sue and MCSO's capacity to be sued with

respect to those claims.  These are legal issues we review de novo.  *See Aegis of Ariz.,*

*L.L.C. v. Town of Marana*, 206 Ariz. 557, ¶ 16, 81 P.3d 1016, 1021 (App. 2003).

¶12            First, the MCSO defendants argue the trial court erred in denying their

motion to dismiss both the § 1983 claims and state tort claims against MCSO on the

ground that it is a nonjural entity.[2]  Governmental entities have no inherent power and

---

[1]Braillard's complaint named additional defendants who subsequently were dismissed from the action.  Pursuant to stipulations between the parties, the claims against another CHS nurse, Gloria Eppinger, were dismissed without prejudice and against Maricopa Integrated Health System with prejudice.  And CHS was dismissed as a nonjural entity.

[2]In discussing this issue, the parties touch on the question whether the Maricopa County Sheriff, acting in his official capacity, is a jural entity.  However, none of the parties has argued the sheriff should be dismissed from this action.  We therefore decline to reach this question.  In any event, "Maricopa County pays its own debts, and it funds the Sheriff's official functions.  Whether the County or the Sheriff is liable is of no

6

possess only those powers and duties delegated to them by their enabling statutes. *Schwartz v. Superior Court*, 186 Ariz. 617, 619, 925 P.2d 1068, 1070 (App. 1996). Thus, a governmental entity may be sued only if the legislature has so provided. *See Kimball v. Shofstall*, 17 Ariz. App. 11, 13, 494 P.2d 1357, 1359 (1972) (holding State Board of Education may not be sued in absence of authorizing statute); *see also* 56 Am. Jur. 2d *Municipal Corporations, Counties, Other Political Subdivisions* § 787 (2010) ("[D]epartments and subordinate entities of . . . counties . . . that are not separate legal entities or bodies do not have the capacity to sue or be sued in the absence of specific statutory authority."). Although A.R.S. § 11-201(A)(1) provides that counties have the power to sue and be sued through their boards of supervisors, no Arizona statute confers such power on MCSO as a separate legal entity.

¶13 Braillard nevertheless asserts that in prior cases MCSO has "admitted in court proceedings that it is a separate entity from the County." However, "there is no doctrine of jural status by estoppel, at least without detrimental reliance in the case at hand." *Payne v. Arpaio*, 2009 WL 3756679, 4 (D. Ariz. 2009). Whether MCSO is a nonjural entity is apparently an issue of first impression in our state courts; however, federal courts in Arizona have addressed this issue on numerous occasions. And, although their decisions have been divided, most—including a number of unpublished orders—have found MCSO to be a nonjural entity for the reasons stated above. *See Lovejoy v. Arpaio*, 2010 WL 466010, 16 (D. Ariz. 2010); *Payne*, 2009 WL 3756679, at 4;

---

practical consequence. One or both paths must be good, and they both lead to the same money." *Payne v. Arpaio*, 2009 WL 3756679, 6 (D. Ariz. 2009).

7

*Flores v. Maricopa County*, 2009 WL 2169159, 3 (D. Ariz. 2009); *Wilson v. Maricopa County*, 463 F. Supp. 2d 987, 1001 (D. Ariz. 2006) (denying reconsideration of prior order dismissing MCSO as nonjural entity). And those decisions declining to dismiss MCSO have done so largely on the ground our state courts have not addressed the issue. *See Auble v. Maricopa County*, 2009 WL 3335425, 3 (D. Ariz. 2009); *Ortega Melendres v. Arpaio*, 598 F. Supp. 2d 1025, 1039 (D. Ariz. 2009). Notably, there is a consensus among Arizona federal decisions that city police departments generally are nonjural entities. *See Payne*, 2009 WL 3756679, at 4 (citing cases). We therefore conclude MCSO is a nonjural entity and should be dismissed from this case.

**¶14**        The MCSO defendants[3] next contend the trial court erred in denying their motion for summary judgment on Braillard's individual standing to bring a wrongful death action pursuant to § 1983.[4] Although the denial of a motion for summary judgment generally is not appealable, "once we have jurisdiction over an order granting summary judgment, we may consider the merits of an order denying summary judgment and direct

---

[3]Although we have concluded MCSO is a nonjural entity, the individual MCSO defendants, Sheriff Arpaio and the detention officers, remain parties to the litigation.

[4]The MCSO defendants do not challenge Braillard's standing, in her capacity as representative of Deborah's estate, to bring a survival action under § 1983. *See Smith v. City of Fontana*, 818 F.2d 1411, 1416 (9th Cir. 1987) ("a section 1983 claim that accrued before death survives the decedent when state law authorizes a survival action as a 'suitable remed[y] . . . not inconsistent with the Constitution and laws of the United States'"), *quoting* 42 U.S.C. § 1988, *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 n.1 (9th Cir. 1999). *See also* A.R.S. § 14-3110 (permitting survival actions); *Barragan v. Superior Court*, 12 Ariz. App. 402, 404-05, 470 P.2d 722, 724-25 (1970) (survival action "permits recovery for the wrong to the injured person and is confined to h[er] personal loss while [wrongful death action] is for the wrong to the beneficiaries, confined to their loss because of the death.").

8

entry of summary judgment if there are no issues of material fact and the movant is entitled to judgment as a matter of law." *Kaufmann v. M & S Unltd., L.L.C.*, 211 Ariz. 314, ¶ 5, 121 P.3d 181, 183 (App. 2005).

¶15 The MCSO defendants argue that, in the absence of direct interference by the state in a particular relationship, there is no violation of any constitutional right to association between a parent and an adult child and thus no basis for Braillard's § 1983 wrongful death claim. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985) (§ 1983 does not create substantive rights but merely provides remedies for deprivations of rights established elsewhere).

¶16 Braillard relies on *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999), which recognized that adult children have "a cognizable liberty interest in continued association" with a parent, pursuant to the Due Process Clause of the Fourteenth Amendment. In *Smith*, the Ninth Circuit Court of Appeals concluded the children, including adult children, of a man shot dead by police could pursue wrongful death claims under § 1983 on the ground that "the same allegation of excessive force giving rise to [the father]'s substantive due process claim based on his loss of life also gives the children a substantive due process claim based on their loss of his companionship." *Id*. at 1420. In reaching that conclusion, the court relied on *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), which also involved a fatal shooting by police, as well as *Morrison v. Jones*, 607 F.2d 1269 (9th Cir. 1979), and its progeny. *See*

9

*Kelson v. City of Springfield*, 767 F.2d 651, 654 (9th Cir. 1985) (relying on *Morrison*), *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986) (relying on *Kelson*).

¶17 However, the Seventh Circuit overruled *Bell* in *Russ v. Watts*, 414 F.3d 783, 787 (7th Cir. 2005), noting, "Most courts that have considered the issue have expressly declined to find a violation of the familial liberty interest where the state action at issue was not aimed specifically at interfering with the relationship." *See Robertson v. Hecksel*, 420 F.3d 1254, 1259 (11th Cir. 2005) (finding no interest); *McCurdy v. Dodd*, 352 F.3d 820, 830 (3d Cir. 2003) (finding no interest); *Butera v. Dist. of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001) (finding no interest); *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 10 (1st Cir. 1986) (finding no interest); *Trujillo v. Bd. of County Comm'rs*, 768 F.2d 1186, 1189-90 (10th Cir. 1985) (recognizing interest where direct effort to interfere with relationship). It also noted that, although the United States Supreme Court had not yet ruled on this issue, it had cautioned courts to "'exercise the utmost care' in extending constitutional protection to an asserted right or liberty interest because, in doing so, we 'place the matter outside the arena of public debate and legislative action.'" *Russ*, 414 F.3d at 789, *quoting Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

¶18 Moreover, *Morrison* itself involved the state's direct interference in a particular relationship, namely, "county officials['] remov[al of] a mentally ill boy from his mother's custody on the ground that she could not adequately care for him." *Smith*, 818 F.2d at 1418. We therefore do not believe that, standing alone, *Morrison* can provide an adequate foundation for finding a constitutional violation based on official actions that were not directed at the parent-child relationship, particularly in light of the

10

overwhelming weight of authority to the contrary. *See Russ*, 414 F.3d at 790. With the overruling of *Bell*, the Ninth Circuit's holding in *Smith* is no longer tenable.[5] We therefore decline to follow *Smith* and, instead, in keeping with the majority position, find Braillard has failed to allege a constitutionally protected right and thus lacks standing to bring a wrongful death action under § 1983.[6]

**§ 1983 Survival Claims**

¶19        Braillard argues the trial court erred in granting summary judgment in favor of the defendants on her § 1983 survival claims. "On appeal from the trial court's grant of summary judgment, we review de novo whether there are any genuine issues of material fact and whether the trial court erred in applying the law." *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, ¶ 4, 7 P.3d 136, 139 (App. 2000). As noted above, we "view the evidence in the light most favorable to the party against whom summary judgment was entered." *Simon v. Safeway, Inc.*, 217 Ariz. 330, ¶ 13, 173 P.3d 1031, 1037 (App. 2007). Summary judgment should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of

---

[5]The Ninth Circuit has not revisited this issue following the Seventh Circuit's overruling of *Bell*. And, although we "may choose to follow substantive decisions of the Ninth Circuit Court of Appeals," we are not persuaded that doing so here would "further predictability and stability of the law." *See Weatherford ex rel. Michael L. v. State*, 206 Ariz. 529, ¶ 9, 81 P.3d 320, 324 (2003).

[6]Nothing in this decision should be perceived as trivializing Braillard's loss. However, "even an interest of great importance may not always be entitled to constitutional protection." *Valdivieso Ortiz*, 807 F.2d at 10. And, although our decision forecloses Braillard's wrongful death action under § 1983, it does not, as we discuss below, foreclose her ability to seek recourse pursuant to Arizona's wrongful death statutes. *See* A.R.S. § 12-612.

11

evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). But we will reverse an order granting summary judgment which necessarily required the trial court to assess "the credibility of witnesses with differing versions of material facts, . . . to weigh the quality of documentary or other evidence, . . . [or] to choose among competing or conflicting inferences." *Id.* at 311, 802 P.2d at 1010.

¶20        Section 1983 allows a plaintiff to assert a cause of action against any person who, under color of state law or authority, deprives another person of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment as convicted prisoners receive under the Eighth Amendment. *Riggens v. Nevada*, 504 U.S. 127, 135 (1992); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). And,

> deliberate indifference to serious medical needs of prisoners [is unconstitutional] . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care . . . . Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *see County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998) (applying deliberate indifference standard "for due process claims based on the medical needs of someone jailed while awaiting trial"). To prevail on a § 1983 claim under these circumstances, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is

12

enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). To be liable, prison officials need not have anticipated injury to a particular victim; it is sufficient if they were aware of a risk to the safety of a particular class of inmates. *Id.* at 843-44. And "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact" for the jury. *Id.* at 842.

### (i)  CHS and MCSO staff

¶21        Viewing the evidence and reasonable inferences derived therefrom in the light most favorable to Braillard, we conclude Braillard produced sufficient facts for a jury to find that Nurse Rodriguez and the named detention officers "failed to act despite [their] knowledge of a substantial risk of serious harm" to Deborah. *See Farmer*, 511 U.S. at 842. There was evidence from their depositions that all six detention officers had been aware that Deborah was seriously ill. Officer Harenberg noted in the log book that Deborah was "complaining of being sick and [unable to] breathe" and testified he had been informed by other inmates she was "coming off drugs." Officer Schwartz, working the same shift, testified that she had read Harenberg's log book entry and that he had told her he was calling CHS about Deborah.

¶22        Either Harenberg or Schwartz apparently informed the visitation officer that Deborah was too sick to have visitors and told Officer Galaviz, who was working the next shift, that Deborah was suffering from drug withdrawal. Galaviz passed that information on to Officer Garfias, who heard Deborah vomiting several times, was informed by other inmates she had defecated on herself, and observed she was in pain.

13

Garfias subsequently arranged for Deborah to be moved from the dormitory to the day room because she was "groaning, yelling, and keeping the whole dorm up." By this time, Deborah apparently was unable to respond to Garfias's questions, looked weak, and needed to be supported by two other inmates. She continued groaning and crying throughout the night within hearing of the detention officers, calling out, "Help me" and "Why me?" Galaviz conducted a security walk during the shift and reportedly told an inmate, "Don't worry about Deborah Braillard. She's getting what she deserves. She's coming off drugs."

¶23     The next morning, Garfias informed Officer Leppert that Deborah was withdrawing from drugs and explained that she had been moved into the television room during the night because she was yelling, vomiting, and defecating on herself. Leppert passed this information on to Officer Akpan, who observed Deborah appeared weak and "very sick" and was "screaming . . . in pain." And shortly after the beginning of her shift, Leppert was informed by one of the other inmates that Deborah had vomited again.

¶24     Despite being aware of Deborah's severe symptoms and believing she was suffering symptoms of drug withdrawal, which they arguably knew could be a life-threatening condition,[7] the officers did little or nothing to obtain medical assistance. Although Harenberg, Akpan, and Leppert asserted they had called CHS, none of the medical staff on duty at the time recalled receiving any such calls, and CHS had no record of them. In any event, none of these officers followed up with any further calls

---

[7]Both Harenberg and Akpan testified they had been trained by MCSO that withdrawing from drugs could be life threatening.

14

when CHS failed to respond. None of the officers mentioned Deborah's condition to the CHS nurses who went to the unit to dispense medications during each shift. And only Garfias and Leppert claim to have attempted to talk directly to Deborah about her condition.

¶25    Nurse Rodriguez testified she was aware of the importance of conducting intake interviews effectively to ascertain the medical histories and medical needs of inmates and knew that denying insulin to a diabetic potentially could be fatal. Nevertheless, her own affidavit suggests she completed the interview with Deborah in fifty-nine seconds,[8] which, according to evidence produced by Braillard, was substantially less time than necessary to do so completely and thoroughly. And another CHS nurse testified she had observed nurses recording inmates' purported responses at intake interviews when inmates had provided no response or had not even been asked the questions. Furthermore, the parties dispute whether Rodriguez had access to but failed to further investigate information on Deborah's arrest record showing she was on prescribed medication. In any event, even absent her knowledge that Deborah was personally at risk, a jury could find Rodriguez had failed to interview Deborah adequately while knowing her actions could pose a substantial risk of serious harm to any inmate who was insulin-dependent or had other serious medical needs. *See Farmer*, 511 U.S. at 843-44.

---

[8]Rodriguez stated, "Each time I asked her a question, [Deborah] answered and I immediately recorded her answer on a computer terminal." Computer records showed fifty-nine seconds elapsed as she typed the responses into Deborah's online medical record.

¶26 Because there was sufficient evidence for a jury to find the detention officers and Rodriguez liable under a deliberate indifference standard, the court erred in granting summary judgment in favor of these defendants both on Braillard's § 1983 claims and her state claims against Rodriguez. *See Farmer*, 511 U.S. at 842; *see also Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010) ("claim of deliberate indifference requires proof of more than gross negligence").

**(ii)    Sheriff Arpaio**

¶27 A jury similarly could find Sheriff Arpaio was aware that his actions or inaction posed a substantial risk of harm to inmates with serious medical needs in Maricopa County jails. "[V]icarious liability is inapplicable to . . . § 1983 suits." *Ashcroft v. Iqbal*, __ U.S. __, __, 129 S. Ct. 1937, 1948 (2009). Therefore, to defeat summary judgment, Braillard had to show Arpaio violated the Constitution through his own individual actions. *See id.* A supervisor may be liable personally where his "failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs[,] . . . a reasonable person in the supervisor's position would understand that the failure to train and supervise constituted deliberate indifference[,] and . . . the supervisor's conduct was causally related to the subordinate's constitutional violation." *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995). And when, like Arpaio, a supervisor is also an official policymaker, he or she also may be liable in an official capacity if "'policy or custom . . . played a part in the violation of federal law.'" *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991), *quoting McRorie v. Shimoda*, 795

F.2d 780, 783 (9th Cir. 1986). The proof of a supervisory official's "individual and official capacity liabilities . . . oftentimes overlaps." *Id.* at 645.

¶28 To demonstrate "deliberate indifference" in the context of inadequate training or supervision, a plaintiff must show that the supervisor "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Herrin v. Treon*, 459 F. Supp. 2d 525, 542 (N.D. Tex. 2006). Here, a 1996 Department of Justice (DOJ) investigation had "concluded that unconstitutional conditions exist[ed] at the [Maricopa County] Jails with respect to . . . deliberate indifference to inmates' serious medical needs." In 1999, Arpaio and the County signed a settlement with DOJ, agreeing that "MCSO staff w[ould] report inmates' apparent serious medical needs to CHS staff" and that "ongoing training [would] be provided continuously during employment of all detention officers . . . [on] rights and responsibilities of inmates; . . . crisis intervention; [and] recognition of the signs and symptoms of chemical dependency." Arpaio therefore not only had notice some six years before Deborah's ordeal that MCSO's existing practices and training protocols were likely to result in constitutional violations, but he had agreed expressly to address their inadequacies.

¶29 Braillard presented some evidence that Arpaio had failed to fulfill his obligations under the agreement and that these failures were causally related to Deborah's death. Specifically, detention officers involved in this case testified that, in the absence of a formal request from an inmate, they were not trained to "act[] as medical liaisons between medical staff and the inmate" or to call for assistance even when the inmate had

17

diarrhea, was vomiting, and apparently was too weak to request medical assistance. They also stated they had been given no training in recognizing the symptoms of drug withdrawal nor had they been trained to notify CHS when they believed an inmate was withdrawing from drugs. As a result, although some of the detention officers allegedly contacted CHS on their own initiative, a jury could find the lack of appropriate training led to an inconsistent and inadequate response to Deborah's symptoms and ultimately caused her death.

¶30        O'Neil, the MCSO officer who was alerted by one of Deborah's friends that Deborah had not received medication for two days, testified that MCSO staff were not trained "to ensure that medical information [about an inmate] . . . was conveyed and acted upon in a timely fashion." Rather, their training and MCSO's applicable procedures apparently provided that their responsibility was limited to faxing such information immediately to the medical staff where the inmate was housed and did not extend to calling the facility or otherwise ensuring the information was being acted upon, even when the information "warranted immediate attention." This practice apparently was in direct conflict with CHS policy and resulted in a delay of approximately twelve hours before Deborah finally received medical assistance.

¶31        Moreover, Arpaio apparently instituted no disciplinary proceedings against any of the detention officers involved nor changed any MCSO training or procedures to prevent similar deaths from occurring in the future. And "[t]he jury properly could find [a] policy or custom from the failure of [Arpaio] to take any remedial steps." *See Larez*,

18

946 F.2d at 647 (failure to discipline officers or establish new procedures following constitutional violation evidence defendant condoned violation).

### (iii) Maricopa County

¶32        A municipality or county is liable under § 1983 "when implementation of its official policies or established customs inflicts the constitutional injury." *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 708 (1978) (Powell, J., concurring). Such an action may be maintained when "'systemic and gross deficiencies in staffing, facilities, equipment, or procedures,'" *Holmes v. Sheahan*, 930 F.2d 1196, 1200 (7th Cir. 1991), *quoting Benson v. Cady*, 761 F.2d 335, 341 (7th Cir. 1985), or "the need for more or different training, [are] so obvious, and . . . so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). "Moreover, for liability to attach in this circumstance the identified deficiency . . . must be closely related to the ultimate injury." *Id*. at 391. But determining whether "the injury [would] have been avoided" absent the deficiency is a "task for the factfinder." *Id*.

¶33        Here, Braillard has provided sufficient evidence for a jury to conclude that deficiencies in staffing, procedures, and training evinced deliberate indifference to the medical needs of pretrial detainees and that these deficiencies were causally related to Deborah's death. The DOJ investigation had concluded that unconstitutional conditions existed with respect to inmates' medical needs and specifically had identified as problems "perfunctor[]y" medical intake interviews and "significant delays in medical treatment."

19

The DOJ found that "a severe lack of resources" was the primary "[s]ystemic factor[]" responsible for inadequate medical care" and recommended increases in staffing levels.

¶34　　　Under the 1999 settlement agreement with the DOJ, the County agreed to hire "sufficient general medicine nursing positions . . . to provide adequate medical care to inmates."　However, Jon Bosch, a consultant hired to carry out a review of CHS staffing, found in 2003 that "the current correctional health care program at Maricopa County [wa]s not in compliance with the basic health care rights provided to inmates under the U.S. Constitution," and his final report to the County concluded that "current staffing [wa]s insufficient to meet the needs of the inmate population."　Specifically, Bosch observed:

> Frequently inmates do not report their health care needs at the time of intake and therefore their conditions go untreated until they request care . . . .　However, because sick call requests are not responded to in a timely manner . . . an inmate's health status is likely to deteriorate while in the custody of . . . Maricopa County.

He found the number of nursing personnel generally to be inadequate and, in particular, recommended an increase in the number of medical assistants available to conduct the intake health-screening process, based on his finding that the screening form could be completed in "approximately eight minutes."

¶35　　　Dr. Todd Wilcox, the CHS medical director at the time of Deborah's death, testified that Bosch's "staffing recommendations were higher than [the County] wanted to fund" and that, when he was appointed in December 2004, CHS "w[as]n't anywhere

close to" adequate staffing and was "deliberately indifferent to the needs of its patients."[9] He testified that then, as now, "the capacity of CHS to see [inmates] d[id] not match the demand for care," the preintake screening was "extremely cursory . . . [, a]nd the level of staff doing [it wa]s not what we would like it to be so that it would be effective."

¶36     However, despite Deborah's death, the County declined to implement Wilcox's proposals for change or to do anything "that was truly effective . . . because to really fix that mismatch [between capacity and demand] requires a significant investment in staff and in resources." Wilcox thus ultimately "reached the conclusion that the County was very much aware of the inadequate healthcare that was provided for the inmates and it just decided not to make the changes." Furthermore, one of the nurses at the Estrella clinic when Deborah died testified that, as a result of inadequate staffing, the clinic was "always overbooked on seeing inmates" and that it could be "days before [requests for medical care] would be looked at."

¶37     Braillard thus presented sufficient evidence for a jury to find that the County was aware of and disregarded "systemic and gross deficiencies" in CHS staffing and procedures and that it knew these deficiencies could result in a violation of inmates' constitutional rights. A jury further could find from this evidence that these deficiencies were a cause of Deborah's death, either because her health screening was inadequate to

---

[9]We find no merit to the County defendants' assertion that Wilcox's testimony would be inadmissible at trial on hearsay grounds. Although not a binding admission on behalf of the County, *see City of Tucson v. Wondergem*, 6 Ariz. App. 570, 572, 435 P.2d 77, 79 (1967), Wilcox's trial testimony would necessarily be "made by the declarant while testifying at the trial" and thus clearly would not be hearsay. *See* Ariz. R. Evid. 801(c).

21

identify her as an insulin-dependent diabetic or because MCSO staff did not respond timely to her pleas for medical care. *See City of Canton*, 489 U.S. at 391.

¶38 Moreover, the County defendants concede Braillard provided evidence that "hypothetically support[s] a *Monell* claim based on the MCSO's training of its detention officers." Because we have concluded MCSO is a nonjural entity, such a claim, based on the training issues identified in our discussion of Arpaio's liability, can be made properly against the County. And, like Arpaio, the County was a signatory to the settlement agreement with the DOJ and therefore was aware that failure to train detention officers to report the serious medical needs of inmates to CHS staff likely would violate those inmates' constitutional rights.

### (iv)   Qualified immunity

¶39 Nor are we persuaded by the claims of qualified immunity asserted by the detention officers, Rodriguez, and Arpaio in his personal capacity.[10] The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defendants argue there is no clearly established right "to expect jails to actively seek to discover the medical needs of an inmate who knows of her own medical problems but conceals them." But the United States Supreme Court has rejected such a

---

[10]Qualified immunity "is unavailable '. . . in an action against a municipality,'" *Pearson v. Callahan*, __ U.S. __, __, 129 S. Ct. 808, 822 (2009), *quoting County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998), or to officials sued in their official capacities, *Brandon v. Holt*, 469 U.S. 464, 472-73 (1985).

22

narrow approach to defining the contours of a constitutional right, under which "an official action [would be] protected by qualified immunity unless the very action in question has previously been held unlawful." Instead, the Court has held a right is clearly established when "in the light of pre-existing law the unlawfulness . . . [is] apparent."[11] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

¶40     The constitutional right of pretrial detainees to adequate medical care is well established. *See City of Canton*, 489 U.S. at 381; *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245 (1983). And the defendants here do not question the existence of, or claim they were unaware of, such a right. Indeed, Rodriguez and several of the detention officer defendants testified they were aware of this right and that it was explained to them in their training. Summary judgment in favor of the defendants therefore was not warranted on this basis. *See Harlow*, 457 U.S. at 818.

**Damages**

¶41     Braillard argues the trial court erred in granting the MCSO defendants' motion for summary judgment on the issues of punitive damages and damages for Deborah's pain and suffering pursuant to § 1983. We consider each issue in turn.[12]

---

[11]Furthermore, the limits of the "right" proffered by the defendants prejudge the extent to which Deborah concealed her diabetes, itself a question of fact for the jury to determine. And, when considering qualified immunity issues on summary judgment, we "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007), *quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[12]Braillard asserts correctly that the defendants have failed to address these issues in their answering briefs, an omission which "c[ould] be considered a confession of error." *See In re 1996 Nissan Sentra*, 201 Ariz. 114, ¶ 7, 32 P.3d 39, 42 (App. 2001).

Because federal civil rights law provides no statutory rule with respect to damages, we look to "the most closely analogous state law . . . if it is consistent with the meaning and purpose of constitutional and federal statutory law. If state law is inconsistent, it must be disregarded in favor of the federal common law." *Bass v. Wallenstein*, 769 F.2d 1173, 1188 (7th Cir. 1985); *see Robertson v. Wegmann*, 436 U.S. 584, 587-90 (1980). And the purpose of § 1983 is "to deter unconstitutional acts committed under color of state law and to compensate the victims of such acts." *Badia v. City of Casa Grande*, 195 Ariz. 349, ¶ 20, 988 P.2d 134, 140 (App. 1999); *see Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984).

**¶42** "[A] jury may be permitted to assess punitive damages in an action under §1983 when the defendant's conduct . . . involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see Flanders v. Maricopa County*, 203 Ariz. 368, ¶ 58, 54 P.3d 837, 846 (2002) (upholding punitive damages award on this basis). And, "in situations where the standard for compensatory liability is as high as or higher than the usual threshold for punitive damages, most courts will permit awards of punitive damages without requiring any extra showing." *Smith*, 461 U.S. at 53; *see also Brown v. Commonwealth of Pa., Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 479 (3d Cir. 2003) (finding "little difference" between terms "deliberate indifference" and "reckless indifference"). We already have concluded a jury could find the defendants liable on a deliberate-

However, in our discretion, we consider the issues on the merits. *See Bugh v. Bugh*, 125 Ariz. 190, 191, 608 P.2d 329, 330 (App. 1980).

24

indifference standard. Thus, there is nothing in federal law to preclude awards of punitive damages against the individual defendants in this case.[13]

¶43 The MCSO defendants nonetheless argued below that punitive damages claims under § 1983 are precluded in Arizona by A.R.S. § 12-820.04, which provides that "[n]either a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages." In support of this argument, the MCSO defendants suggested the Arizona statute is not inconsistent with the purpose of § 1983 and therefore controls with respect to punitive damages claims because "compensatory damages" are an adequate remedy for civil rights violations under § 1983 and the immunity in § 12-820.04 is "narrowly tailored to public employees acting in the scope of employment." We disagree.

¶44 Far from being narrowly tailored, the application of § 12-820.04 suggested by these defendants would preclude punitive damages for most, if not all, § 1983 claims, which require that the defendant have acted "under color of state law or authority." 42 U.S.C. § 1983. And, under circumstances like those present here, any compensatory damages are likely to be modest. Thus, "'[t]o disallow punitive damages in Section 1983 actions solely on the basis of [§ 12-820.04] would seriously hamper the deterren[t] effect of Section 1983.'" *See Bass*, 769 F.2d at 1190, *quoting Bell*, 746 F.2d at 1241. Section

---

[13]The parties agree punitive damages are not available against the County or Arpaio in his official capacity. *See Mitchell v. Dupnik*, 75 F.3d 517, 527 (9th Cir. 1996) (counties and government officials sued in their official capacity immune from punitive damages under § 1983).

12-820.04 is therefore inconsistent with the purpose of § 1983 and must "give way to federal common law rules that permit recovery." *Id*.

¶45 Moreover, such a conclusion is congruent with this court's prior decisions. *See Badia*, 195 Ariz. 349, ¶ 25, 988 P.2d at 141 (§ 12-820.04 "would not necessarily preclude a punitive damage award under § 1983 against those who commit civil rights violations"); *Carrillo v. State*, 169 Ariz. 126, 129, 817 P.2d 493, 496 (App. 1991) (noting plaintiff's right to seek punitive damages from individual defendant under § 1983 "[b]alanced [by] . . . the right of a defendant named in his personal capacity to assert a defense of qualified or absolute immunity, a defense not available to one named in his official capacity"); *see also Flanders*, 203 Ariz. 368, ¶ 58, 54 P.3d at 846 (upholding punitive damage award under § 1983).

¶46 On the issue of damages for Deborah's pain and suffering, the MCSO defendants argued that A.R.S. § 14-3110, which bars such claims under state law, should also preclude those damages under § 1983. There is no Arizona case deciding this issue where the constitutional violation asserted was the cause of the victim's death.[14] However, of the courts in other jurisdictions that have addressed the issue, the overwhelming majority have concluded it would be inconsistent with the purposes of

---

[14]In *Badia*, this court followed the United States Supreme Court's precedent in *Robertson v. Wegmann*, 436 U.S. 584, 594 (1978), to find that precluding such damages pursuant to § 14-3110 was not inconsistent with the purposes of § 1983 where "the alleged constitutional violation . . . did not result in [the victim]'s death." *Badia*, 195 Ariz. 349, ¶ 23, 988 P.2d 134, 141. However, both *Badia* and *Robertson* expressly declined to consider "whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death." *Robertson*, 436 U.S. at 594.

§ 1983 to preclude pain and suffering damages pursuant to state law. *See Andrews v. Neer*, 253 F.3d 1052, 1063 (8th Cir. 2001); *Berry v. City of Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990); *Bass*, 769 F.2d at 1190; *Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984); *McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir. 1983); *Garcia v. Whitehead*, 961 F. Supp. 230, 233 (C.D. Cal. 1997); *but see Garcia v. Superior Court*, 49 Cal. Rptr. 2d 580, 581 (Ct. App. 1996).

¶47 In *Berry*, the Tenth Circuit Court of Appeals addressed whether, under circumstances such as these, damages in a survival action under § 1983 were limited to those recoverable in a survival action under Oklahoma law, which, like §14-3110, did not include damages for pain and suffering. 900 F.2d at 1500. It found that Oklahoma law, "[a]s applied to th[at] case, . . . would provide extraordinarily limited recovery, possibly only damages [for] property loss, of which there were none, and loss of decedent's earnings between the time of injury and death, of which there also were none." *Id.* at 1504. The court therefore concluded "the Oklahoma survival action is clearly deficient in both its remedy and its deterrent effect" and a survival action under § 1983 "must make available to plaintiffs sufficient damages to serve the deterrent function central to the purpose of § 1983," including damages for "pain and suffering before death." *Id.* at 1504, 1507.

¶48 Here, applying § 14-3110 to bar damages for Deborah's pain and suffering similarly would defeat the remedial and deterrent functions of § 1983. Under the

circumstances in this case, any economic damages would be relatively insignificant.[15] And although, as discussed above, Braillard is not barred from seeking punitive damages, such damages are "never awarded as of right, no matter how egregious the defendant's conduct"; unlike compensatory damages, they are awarded only in the jury's discretion. *Smith*, 461 U.S. at 52. Furthermore, the amount of punitive damages, if awarded, "'will be governed by the financial condition of the individual officer without regard to the pain and suffering he may have inflicted on the decedent.'"[16] *See Garcia v. Whitehead*, 961 F. Supp. at 233, *quoting Williams v. City of Oakland*, 915 F. Supp. 1074, 1078 (N.D. Cal. 1996). Consequently, because "the survival statutes of [Arizona] are hostile to promoting deterrence, protection and vindication against § 1983 civil rights infringements perpetrated under color of law, [we] must implement the congressional intent by allowing survival" of damages for pain and suffering.[17] *See Jaco*, 739 F.2d at 245.

---

[15]In any event, Braillard is not seeking economic damages.

[16]We thus are not persuaded by the single line of California cases cited by the MCSO defendants, which held that provisions of California law, including the authorization of punitive damages, were sufficient "to fulfill the compensatory and deterrent purposes of the federal Civil Rights Act" and hence that California's prohibition of damages for pre-death pain and suffering was not inconsistent with § 1983. *Garcia v. Superior Court*, 49 Cal. Rptr. 2d at 586. And we note that *Garcia v. Superior Court* is not controlling even within California. *See Garcia v. Whitehead*, 961 F. Supp. at 233 (declining to follow *Garcia v. Superior Court*).

[17]Although the minimal damages otherwise available would undercut the potential effectiveness of § 1983 both as a deterrent and as a remedy, we do not presume to assess the actual deterrent value of permitting the survival of a decedent's claim for pain and suffering. A serious analysis of this issue "would be quite complex and require extensive empirical work" that an appellate court is ill-equipped to undertake. *See Venerable v. City of Sacramento*, 185 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002).

**Negligence Claims**

¶49      In their cross-appeal, the MCSO defendants argue the trial court erred in denying their motion for summary judgment on Braillard's state claims for negligence and gross negligence. They contend Deborah's failure to disclose her diabetes was "an intervening and superseding cause, and therefore the proximate cause of her own death, excusing any defendant from liability."

¶50      "The proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *McDowell v. Davis*, 104 Ariz. 69, 71, 448 P.2d 869, 871 (1968). There may "be more than one 'proximate cause' without which the resulting injuries would not have occurred," *Smith v. Chapman*, 115 Ariz. 211, 214, 564 P.2d 900, 903 (1977), and "[t]he defendant's act or omission need not be a 'large' or 'abundant' cause of the injury; even if defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct," *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990). "Ordinarily, the question of proximate cause is a question of fact for the jury"; thus, to defeat summary judgment, a plaintiff "need only present probable facts from which the causal relationship reasonably may be inferred." *See id.*

¶51      Whether and to what extent Deborah deliberately concealed the fact and severity of her diabetes are themselves contested questions of fact. And, as discussed above, Braillard presented sufficient evidence for a jury to find that the detention officer defendants had failed to respond adequately to Deborah's obvious signs of serious illness

29

and that this failure contributed at least "a little" to her death, regardless of whether they knew the medical cause of those symptoms.[18] *See Robertson*, 163 Ariz. at 546, 789 P.2d at 1047. Thus, this question is not one of proximate cause that could exonerate the defendants from liability as a matter of law but one of "the existence and application of contributory negligence," on which the jury is "the sole arbiter." *See Williams v. Thude*, 188 Ariz. 257, 260, 934 P.2d 1349, 1352 (1997). The trial court therefore did not err in denying the MCSO defendants' motion for summary judgment on this basis.

**Discovery Issues**

¶52        On cross-appeal, the County defendants argue the trial court erred in its resolution of two discovery disputes. "[I]n matters of discovery a trial court has broad discretion which will not be disturbed absent a showing of abuse." *Brown v. Superior Court*, 137 Ariz. 327, 331, 670 P.2d 725, 729 (1983). But "a court abuses its discretion when it commits an error of law in reaching its decision or the record fails to provide 'substantial support' for the decision." *Am. Family Mut. Ins. Co. v. Grant*, 222 Ariz. 507, ¶ 11, 217 P.3d 1212, 1216 (App. 2009). Rule 26(b)(1)(A), Ariz. R. Civ. P., permits the discovery of information "relevant to the subject matter involved in the pending action" and, if not admissible itself, "reasonably calculated to lead to the discovery of admissible evidence." *See id.* But "'[a] trial court must always consider the danger of injecting

---

[18]Nor are we persuaded by the MCSO defendants' related argument that, because of Deborah's alleged failure to disclose her diabetes, "no reasonable juror could conclude that the standard of care was breached." As discussed above, a juror could find the officers' failure to react appropriately to her severe symptoms was unreasonable, even if they were ignorant of the cause of those symptoms.

collateral issues into a case.'" *Am. Family*, 222 Ariz. 507, ¶ 15, 217 P.3d at 1217, *quoting Vegodsky v. City of Tucson*, 1 Ariz. App. 102, 107, 399 P.2d 723, 728 (1965).

¶53        First, the County defendants contend the trial court erred in denying the motion to compel production of Deborah's computer, which they believe contains information regarding business transactions Deborah made before her death, including allegedly illicit activity. "Evidence of the decedent's capacity and disposition to earn money" is generally relevant to the issue of damages in a wrongful death action. *Kemp v. Pinal County*, 8 Ariz. App. 41, 45, 442 P.2d 864, 868 (1968). And, because "surviving parties may recover for the loss of decedent's companionship, comfort, and guidance, decedent's character in this regard in relationship to the surviving parties" is also relevant. *Id.* (citation omitted).

¶54        The trial court found the information allegedly contained on Deborah's computer to be irrelevant because "no economic relief is being sought, other tha[n] relief for loss of consortium." The County defendants nonetheless reassert the claim they made below that not only is the information relevant to Deborah's earning capacity but that "evidence showing that [Deborah] was involved in illicit activities on the internet, including credit card fraud and selling stolen property, is pertinent to the jury's determination of damages for . . . Braillard's asserted loss of companionship, guidance, and comfort as a result of [Deborah]'s death." However, any connection between any such activities and the quality of the two women's relationship is facially tenuous and, in the absence of any evidence, completely speculative. *See Brown*, 137 Ariz. at 331, 670 P.2d at 729. Moreover, the County defendants have failed to provide a transcript of the

31

hearing on this issue below. In the absence of such a transcript, we presume that whatever transpired at the hearing supported the trial court's ruling.[19] *Johnson v. Elson*, 192 Ariz. 486, ¶ 11, 967 P.2d 1022, 1025 (App. 1998). We therefore cannot conclude the court abused its discretion in declining to compel production of Deborah's computer.

¶55 The County defendants next argue the trial court erred in granting Braillard's motion for a protective order quashing defendants' subpoena duces tecum for the disclosure of employment records of one of her witnesses, Jacqueline Moore, who was listed as an expert on the standard of care for correctional health facilities. A trial court may "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Ariz. R. Civ. P. 26(c)(1).

¶56 The County defendants issued the subpoena after discovering that Moore's curriculum vitae omitted her recent prior employment with a healthcare management company. The subpoena initially requested Moore's entire employment file but, following Braillard's motion for a protective order, was modified to include "only those documents that address, arise [sic], or otherwise concern Dr. Moore's job performance and termination, including but not limited to, any and all performance evaluations, memoranda, discipline notices, e-mails, correspondence, and termination notices."

---

[19]Nor are we persuaded that Braillard waived her objection to the County's request for production of the computer by failing to respond adequately within the forty-day period for such objections provided by Rule 34(b), Ariz. R. Civ. P. Although the County contends Braillard's response by electronic mail within the requisite time did not constitute a sufficient "formal written response," it cites no authority to support this contention. And, in any event, the rule permits the trial court to allow a longer time for such responses. Ariz. R. Civ. P. 34(b).

**¶57** The County defendants contend that "Dr. Moore's job performance and the reasons for her termination relate directly to her expertise and to her qualification to give opinions pertaining to the applicable standard of care for correctional health providers." We disagree. In *Banta v. Superior Court*, 112 Ariz. 544, 545, 544 P.2d 653, 654 (1976), our supreme court considered a motion to compel the discovery of information from expert medical witnesses regarding their patients. The court concluded the motion went "beyond the scope of proper discovery" because it was "not relevant to the standard of care" to which the experts would be testifying. *Id.* In the present case, Moore's employment records similarly are irrelevant to her anticipated testimony on the standard of care in correctional health facilities, and the trial court did not abuse its discretion in issuing the order of protection. *See Brown*, 137 Ariz. at 331, 670 P.2d at 729.

**¶58** Even where this court has found evidence to be relevant for impeachment purposes, we have "recognized that overbroad discovery requests have a chilling effect on would-be experts" and have been reluctant to approve requests that unreasonably invade an expert's privacy when less intrusive means of obtaining evidence are available. *Am. Family*, 222 Ariz. 507, ¶¶ 20-21, 217 P.3d at 1218. Here, Moore was deposed subsequently and testified openly about the circumstances of her departure from the company. As a result, this is "not . . . a recalcitrant expert or party who is refusing to provide . . . information" in which case "a broad subpoena" might be warranted. *See id.* ¶¶ 27-28. Furthermore, as with the previous issue, because the County defendants have failed to provide a transcript of the hearing on the issue below, we presume that the record supports the trial court's ruling and that its reasoning was proper. *See Johnson*,

33

192 Ariz. 486, ¶ 11, 967 P.2d at 1025; *Ariz. Dep't of Econ. Sec. v. Valentine*, 190 Ariz. 107, 110, 945 P.2d 828, 831 (App. 1997).

## Disposition

**¶59**       For the reasons stated above, we reverse the trial court's entry of summary judgment in favor of all defendants on Braillard's § 1983 survival claims and her associated claims for damages and in favor of Rodriguez on Braillard's state claims. We also reverse the court's entry of summary judgment in favor of Braillard with respect to her standing to bring a wrongful death action pursuant to § 1983 and its denial of the defendants' motion to dismiss MCSO. And, we direct the trial court to enter judgment dismissing the claims against MCSO. However, we affirm the court's discovery rulings and its denial of the defendants' motion for summary judgment on Braillard's state claims.

**¶60**       Braillard requests attorney fees on appeal.[20]   However, she has not "articulate[d] an appropriate statutory basis for that request." *See Fid. Nat'l Title Co., Inc. v. Town of Marana*, 220 Ariz. 247, ¶ 17, 204 P.3d 1096, 1100 (App. 2009); *see also Bed Mart, Inc. v. Kelley*, 202 Ariz. 370, ¶ 24, 45 P.3d 1219, 1224 (App. 2002) (request for fees under Rule 21, Ariz. R. Civ. App. P., insufficient because rule "does not provide a substantive basis for a fee award"). We therefore deny her request for attorney fees.

---

[20]Because the County defendants are not the prevailing party on cross-appeal, we do not consider the merits of their request for attorney fees. And, to the extent the County defendants seek an award of attorney fees in the action below, any such award would be premature. *See Esmark, Inc. v. McKee*, 118 Ariz. 511, 514, 578 P.2d 190, 193 (App. 1978).

However, as the prevailing party on appeal, Braillard is entitled to recover her costs upon compliance with Rule 21.

/s/ Garye L. Vásquez
GARYE L. VÁSQUEZ, Judge

CONCURRING:

/s/ Peter J. Eckerstrom
PETER J. ECKERSTROM, Presiding Judge

/s/ J. William Brammer, Jr.
J. WILLIAM BRAMMER, JR., Judge